Opinion for the court filed by Circuit Judge BRYSON, in which Chief Judge RADER and Circuit Judges NEWMAN, LOURIE, LINN, and MOORE join.
Concurring opinion filed by Circuit Judge PROST, in which Circuit Judge MAYER joins.
Dissenting opinion filed by Circuit Judge DYK, in which Circuit Judge GAJARSA joins.
BRYSON, Circuit Judge.
This case requires us to consider the scope of the doctrine of patent misuse. Patent misuse developed as a nonstatutory defense to claims of patent infringement. In the licensing context, the doctrine limits a patentee’s right to impose conditions on a licensee that exceed the scope of the patent right. Because patent misuse is a judge-made doctrine that is in derogation of statutory patent rights against infringement, this court has not applied the doctrine of patent misuse expansively. In this case, we adhere to that approach, and we sustain the decision of the International *1322 Trade Commission that the doctrine of patent misuse does not bar the intervenor, U.S. Philips Corporation, from enforcing its patent rights against the appellants Princo Corporation and Princo America Corporation (collectively, “Princo”).
I
A
This case has a lengthy history, which we will recite only in pertinent part. The technology at issue concerns two types of digital storage devices — recordable compact discs (“CD-Rs”) and rewritable compact discs (“CD-RWs”). Those devices were developed in the 1980s and 1990s. The companies that developed the CDR/RW technology generated technical standards to ensure that discs made by different manufacturers would be compatible and playable on machines that were designed to read the earlier generation compact discs (“CDs”) and “read-only” compact discs (“CD-ROMs”). The standards that were generated for CD-Rs and CD-RWs were collected in a publication entitled “Recordable CD Standard,” informally known as the “Orange Book.” The CD-R/RW technology was developed principally by Philips and Sony Corporation, working in collaboration. Philips and Sony also jointly developed the Orange Book standards.
One aspect of the CD-R/RW technology — and the corresponding Orange Book standards — is at issue in this case. In the course of their work, the Sony and Philips engineers had to address the problem of how to encode position information in the disc so that a consumer’s CD reader/writer could maintain proper positioning while writing data to the disc. Philips and Sony proposed different solutions to that problem. Philips’s solution was to use an analog method of modulating the frequency of the “groove” on the disc so as to add location codes to the disc. One of Sony’s proposed solutions was to use a digital method to encode location codes into the disc groove. Philips’s approach was later set forth in two of the patents at issue in this case, referred to as the “Raaymakers patents.” Sony’s approach was set forth in one of its own patents, referred to as the “Lagadec patent.”
After reviewing the competing solutions, the Sony and Philips engineers agreed that they would use the Raaymakers approach to solving the problem, not the Lagadec approach. The engineers from both companies agreed that the Raaymakers approach “was simple and ... worked very well.” By contrast, as the Commission found in the course of this litigation, the Lagadec approach was “prone to error” and would have been “very difficult” to implement. Philips and Sony therefore incorporated the Raaymakers approach in the Orange Book as the standard for manufacturing CD-R/RW discs.
Philips and Sony sought to commercialize their technology by offering licenses to the patents that were required to manufacture CD-R/RW discs in accordance with the Orange Book standards. Administering the licensing program, Philips offered several different “package” licenses to the Philips and Sony patents (and those of several other patent holders). Philips included in the patent packages those patents that it regarded as potentially necessary to make Orange-Book-compliant CD-R or CD-RW discs, including the Raaymakers and Lagadec patents. The package licenses contained a “field of use” restriction, limiting the licensees to using the licensed patents to produce discs according to the Orange Book standards. After 2001, Philips offered additional package options, grouping the patents into two categories, denominated “essential” and “nonessential,” for producing compact *1323 discs that complied with the technology standards set forth in the Orange Book.
In the late 1990s, Princo sought to manufacture discs and import them into this country, and it entered into a package license agreement with Philips. Soon after entering the agreement, however, Princo stopped paying the licensing fees required by the agreement. Philips then filed a complaint with the International Trade Commission, alleging that Princo (along with several other parties) was violating section 337(a)(1)(B) of the Tariff Act of 1930, 19 U.S.C. § 1337(a)(1)(B), by importing CD-Rs and CD-RWs that infringed Philips’s patents.
B
In the course of proceedings before an administrative law judge, Princo raised the affirmative defense of patent misuse. Among other arguments, Princo contended that Philips had improperly forced Princo and other licensees, as a condition of licensing patents that were necessary to manufacture CD-Rs or CD-RWs, to take licenses to other patents that were not necessary to manufacture those products.
The administrative law judge agreed with Philips that Princo had infringed various claims of the six asserted Philips patents and that the patents were not invalid. However, the administrative law judge denied relief to Philips on the ground that the Philips patents were unenforceable because of patent misuse. The administrative law judge found, inter alia, that the package licensing agreements offered by Philips constituted impermissible tying arrangements because they forced manufacturers to license extraneous patents in addition to the patents that the manufacturers wanted to license. That tying arrangement, according to the administrative law judge, rendered all of Philips’s patents in suit unenforceable. The administrative law judge also held Philips’s patents unenforceable based on price fixing, price discrimination, and restraint of trade.
On Philips’s petition for review, the Commission affirmed the administrative law judge’s ruling that Philips’s package licensing practice constituted patent misuse for unlawfully tying patents that were essential for the Orange Book standard to licenses for other patents that were not essential. That practice was improper, according to the Commission, because it forced licensees to purchase licenses to patents that they did not want or need, and it did not allow them the option of licensing individual patents. The Commission did not address the administrative judge’s ruling that the patent pooling arrangements between Philips and its colicensors, including Sony, constituted price fixing and price discrimination, or the administrative judge’s ruling that the royalty structure of the patent pools resulted in an unreasonable restraint of trade.
Philips appealed to this court, and we reversed. U.S. Philips Corp. v. Int’l Trade Comm’n (Philips I), 424 F.3d 1179 (Fed.Cir.2005). We rejected the Commission’s theory that Philips’s package licensing practice constituted patent misuse by improperly tying nonessential patents to essential ones. We explained that Philips gave its licensees the option of using any of the patents in the package at the licensee’s option, and that Philips charged a uniform fee to permit the manufacture of discs covered by the patented technology regardless of which patents the licensee used in its manufacturing process. Philips did not require the licensee to use any particular technology in any of the patents, including the patents that Princo complained were “nonessential.” In effect, we concluded, Philips was simply charging a fixed licensing fee for licensees to manufacture discs under the Orange Book stan *1324 dard. We noted that including additional patents in the package was the functional equivalent of promising not to sue licensees on any of the patents in the group, which had the advantages of minimizing transaction costs and ensuring against the risk of post-agreement disputes as to whether those additional patents were required to practice the patented technology.
We also reversed the Commission’s ruling that Philips had engaged in patent misuse under the rule of reason. As to that issue, we held that the Commission’s conclusion that Philips’s patent package licensing program was anticompetitive was predicated on legal errors and on factual findings that were not supported by substantial evidence. We remanded the case to the Commission for further proceedings because the Commission had not addressed all the grounds on which the administrative law judge had based his ruling.
C
On remand, the Commission rejected Princo’s remaining theories of patent misuse. The Commission first rejected Princo’s argument that Philips committed patent misuse by combining with its horizontal competitors to fix the price of patent licenses in the relevant market, i.e., the market for licensing CD-R/RW patents. The Commission found that there was no evidence in the record that the patents in the joint package licenses covered technologies that were close substitutes, or that the pool licensors would have competed in the technology licensing market absent the pooling arrangements. Consequently, the Commission found that the joint package licenses had not been shown to constitute horizontal price fixing.
In particular, the Commission rejected Princo’s argument that Sony’s Lagadec patent should not have been included in the patent packages. The Commission noted Philips’s contention that claim 6 of the Lagadec patent covered a portion of the Orange Book standard and therefore was technically a “blocking patent.” The Commission explained that if Philips was correct that Lagadec was a necessary part of the Orange Book patent package, then “no misuse flows from including the [Lagadec] patent in the joint licenses.” Even if a license to the Lagadec patent was not necessary to manufacture Orange-Book-compliant discs, the Commission stated, there was no merit to Princo’s theories of patent misuse based on the Lagadec patent, because “there has been no showing that the Lagadec ... patent competes with another patent in the pool, no showing that the pool licensors would have competed in the technology licensing market absent the pooling arrangement, and no showing of the anticompetitive effect required under a rule of reason analysis.”
After an extensive analysis of the evidence presented to the administrative law judge, the Commission concluded that the record “does not support a finding that the Lagadec '565 patent competes with the [Raaymakers] patents,” and that Princo “failed to identify evidence demonstrating that, absent the pooling arrangements, the pool licensors would have competed in the technology licensing market.” The Commission noted that the administrative law judge had found that testimony at the hearing indicated that the Lagadec patent “constitutes completely different technology that does not work well according to the Orange Book standards” and that Lagadec was therefore “extraneous to the Orange Book.” In particular, the administrative law judge had found that Lagadec constituted “at best, a substitute technology” that could not be used to manufacture Orange-Book-compliant discs, and “at worst, an extraneous, nonworking add-on to the patent pool.” Under those circum *1325 stances, the Commission explained, licensees who wished to make Orange-Book-compliant discs were, at most, required to accept something they did not want and would not otherwise have sought to obtain from other sellers.
With respect to the contention that including the Lagadec patent in the license packages enabled Philips to secure Sony’s adherence to the Orange Book standards and thereby foreclose competition, the Commission found that theory speculative and unsupported by the evidence in the record. Because there was no evidence that Sony would have entered the CDR/RW market with a system based on the Lagadec technology and no evidence that such a system would have become a significant competitive force in that market, the Commission held that theory insufficient to support a finding of patent misuse.
D
On Princo’s appeal, a divided panel of this court ruled against the Commission and Philips. Princo Corp. v. Int’l Trade Comm’n, 563 F.3d 1301 (Fed.Cir.2009). Although the panel rejected several of Princo’s arguments, it vacated the Commission’s remedial orders and remanded the case for further proceedings on one issue.
At the outset, the panel unanimously rejected Princo’s argument that Philips had engaged in patent misuse through improper “tying” by including the Lagadec patent in the Orange Book license packages. The court noted that while grouping patents together in package licenses has anticompetitive potential, it “also has potential to create substantial procompetitive efficiencies” such as clearing possible blocking patents, integrating complementary technology, and avoiding litigation. 563 F.3d at 1308. The court explained that the inclusion in a package license of the patents that are necessary to enable the practice of the particular technology “is not tying of the type that patent misuse doctrine seeks to prevent.” Id. Because the court concluded that it would have been reasonable for a manufacturer to believe that a license under the Lagadec patent was necessary to practice the Orange Book technology, and because “one of the major potential efficiencies of package licensing in the context of innovative technology is the avoidance of ‘uncertainty that could only be resolved through expensive litigation,’ ” the court ruled that the “inclusion of the Lagadec patent in the patent pool did not give rise to an illegal tying arrangement.” Id. at 1310-11.
The panel also unanimously rejected Princo’s argument that Philips had violated the principle of Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), that “conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent [is] misuse.” Because, at the time the package licenses were executed, “it appeared that Lagadec reasonably might be necessary to manufacture Orange Book compact discs,” the panel concluded that “it cannot fairly be said on these facts that a royalty is paid on products which do not use the teaching of the Lagadec patent.” Princo, 563 F.3d at 1312-13.
On one issue, however, the panel majority ruled against Philips. The panel noted that Philips I did not consider whether Philips and Sony agreed to suppress the Lagadec technology and “whether an agreement that would prevent the development of alternatives [to the licensed technology] would constitute misuse under a theory of elimination of competition or price fixing.” 563 F.3d at 1314. The panel then stated that, in contrast to package licenses, “there are no benefits to be obtained from an agreement between patent *1326 holders to forego separate licensing of competing technologies,” and that such agreements are “not within the rights granted to a patent holder” and can constitute an antitrust violation. Id. at 1315-16. The panel recognized that “the burden of proving misuse, and the corresponding risk of having made an insufficient record, lies with Princo.” Id. at 1321. Nonetheless, the panel directed the Commission to reexamine the record to determine whether “Philips and Sony agreed not to license Lagadec in a way that would allow a competitor ‘to develop, use or license the [Lagadec] technology to create a competing product,’ ” i.e., a product that would compete with the technology of the Raaymakers patents, id. at 1313, and whether, if there was such an agreement, the suppressed technology “could not have been viable,” which would “negate a charge of misuse,” id. at 1318-19.
The dissenting judge would have affirmed the Commission. With respect to the suggestion that Sony and Philips had suppressed Lagadec as a platform for manufacturing discs that would compete with Orange-Book-compliant discs, the dissenting judge would have rejected that theory of patent misuse as a factual matter based on the Commission’s findings that the Lagadec technology did not work well and would not have competed with the Orange Book technology.
Philips, Princo, and the Commission all filed petitions for rehearing en banc. The court granted the petitions filed by Philips and the Commission, but denied the petition filed by Princo. Although Philips and the Commission have raised a number of issues in their petitions and in their briefs on rehearing en banc, we address only one — Philips’s argument that regardless of whether Philips and Sony agreed to suppress the technology embodied in Sony’s Lagadec patent, such an agreement would not constitute patent misuse and would not be a defense to Philips’s claim of infringement against Princo. For the reasons set forth below, we conclude that the conduct alleged in this ease is not the type of conduct that could give rise to the defense of patent misuse and we therefore affirm the Commission’s orders granting relief against Princo.[1]
II
A
The doctrine of patent misuse has its origins in a series of Supreme Court cases, beginning with the 1917 decision in Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). In that case, which involved a patent on a motion picture projector, the Court addressed whether a patentee could require that the projector be used only with certain films, by “prescribing] by notice attached to a patented machine the conditions of its use and the supplies which must be used in the operation of it, under pain of infringement of the patent.” Id. at 509, 37 S.Ct. 416. The Court concluded that such a restriction imposed on the purchasers of the patented projectors was invalid because
a film is obviously not any part of the invention of the patent in suit; because it is an attempt, without statutory warrant, to continue the patent monopoly in this particular character of film after it has expired, and because to enforce it would be to create a monopoly in the manufacture and use of moving picture films, wholly outside of the patent in suit and of the patent law as we have interpreted it.
*1327 Id. at 518, 37 S.Ct. 416. Since the Court regarded the requirement to use particular films as beyond the legitimate scope of the patent, it held that the patent could not be enforced against a purchaser who used the patented projector with unsanctioned films.
Fourteen years later, in Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931), the Court held that it was improper for the owner of a patent on “refrigerating transportation packages” for transporting and storing dry ice to insist that licensees of that patent purchase their dry ice from the patent owner or its affiliates. The Court stated that the patentee “may not exact as the condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor.” 283 U.S. at 31, 51 S.Ct. 334. The seller of dry ice, the Court stated, “has no right to be free from competition in the sale of solid carbon dioxide. Control over the supply of such unpatented material is beyond the scope of the patentee’s monopoly.” Id. at 33, 51 S.Ct. 334. Accordingly, the Court ruled that the party that had supplied dry ice to one of the patentee’s licensees could not be held liable for contributory infringement of the patent.
In a third case, Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), the patentee owned a patent on a machine used to add salt to canned foods. The patented machines were leased to canners on the condition that the canners would use salt tablets purchased from the patentee. When one of the patentee’s lessees used the machine with its own salt tablets, the patentee sued for infringement. The Supreme Court held that the patent was unenforceable on the ground that the patentee had unlawfully used the patent “to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant.” Id. at 492, 62 S.Ct. 402.
In those cases, and several others in the same line of authority, the Supreme Court established the basic rule of patent misuse: that the patentee may exploit his patent but may not “use it to acquire a monopoly not embraced in the patent.” Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U.S. 637, 643, 67 S.Ct. 610, 91 L.Ed. 563 (1947). As for the most common form of patent misuse — requiring the purchase of an unpatented product as a condition for obtaining a license to the patent, the Court observed, “He who uses his patent to obtain protection from competition in the sale of unpatented materials extends by contract his patent monopoly to articles as respects which the law sanctions neither monopolies nor restraints of trade.” Id. at 644, 67 S.Ct. 610.
The Court applied the same reasoning to licenses requiring the payment of licensing fees after the expiration of the licensed patent and thus having the effect of extending the life of the patent beyond the statutory period. In Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), the Court explained that a patent “empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the purchase or use of unpatented ones.” Id. at 33, 85 S.Ct. 176.
As applied to patent licensing agreements, the Supreme Court put the matter succinctly in Zenith, 395 U.S. at 136, 89 S.Ct. 1562:
[Tjhere are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. *1328 Among other restrictions upon him, he may not condition the right to use his patent on the licensee’s agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly.
In our cases applying the Supreme Court’s patent misuse decisions, we have characterized patent misuse as the patentee’s act of “impermissibly broaden[ing] the ‘physical or temporal scope’ of the patent grant with anticompetitive effect.” Windsurfing Int’l, Inc. v. AMF, Inc., 782 F.2d 995, 1001 (Fed.Cir.1986). When the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant, we have held that an accused infringer may invoke the doctrine of patent misuse to defeat the patentee’s claim. See Monsanto Co. v. McFarling, 363 F.3d 1336, 1341 (Fed.Cir.2004); Va. Panel Corp. v. MAC Panel Co., 133 F.3d 860, 870 (Fed.Cir.1997); Senza-Gel Corp. v. Seiffhart, 803 F.2d 661 (Fed.Cir.1986).
In B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419 (Fed.Cir.1997), and Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed.Cir.1992), we explained the rationale underlying the doctrine. As a general matter, the unconditional sale of a patented device exhausts the patentee’s right to control the purchaser’s use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods. That “exhaustion” doctrine does not apply, however, to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the “use” rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld. See Gen. Talking Pictures Corp. v. W. Elec. Co., 304 U.S. 175, 181, 58 S.Ct. 849, 82 L.Ed. 1273 (1938) (“Patent owners may grant licenses extending to all uses or limited to use in a defined field.”). When those contractual conditions violate public policy, however, as in the case of price-fixing conditions and tying restraints, the underlying patents become unenforceable, and the patentee loses its right to sue for infringement or breach of contract. B. Braun, 124 F.3d at 1426; Mallinckrodt, 976 F.2d at 706.
The doctrine of patent misuse is thus grounded in the policy-based desire to “prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right.” Mallinckrodt, 976 F.2d at 704. It follows that the key inquiry under the patent misuse doctrine is whether, by imposing the condition in question, the patentee has impermissibly broadened the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects. B. Braun, 124 F.3d at 1426. Where the patentee has not leveraged its patent beyond the scope of rights granted by the Patent Act, misuse has not been found. See Monsanto, 363 F.3d at 1341 (“In the cases in which the restriction is reasonably within the patent grant, the patent misuse defense can never succeed.”); Virginia Panel, 133 F.3d at 869 (particular practices by the patentee “did not constitute patent misuse because they did not broaden the scope of its patent, either in terms of covered subject matter or temporally”).
In determining whether a particular licensing condition has the effect of impermissibly broadening the patent grant, courts have noted that the patentee begins with substantial rights under the patent grant — “includ[ing] the right to suppress the invention while continuing to prevent all others from using it, to license others, or to refuse to license, ... to charge such royalty as the leverage of the patent monopoly permits,” and to limit the scope of *1329 the license to a particular “field of use.” United States v. Studiengesellschaft Kohle, m.b.H., 670 F.2d 1122, 1127, 1133 (D.C.Cir.1981). Given that the patent grant entitles the patentee to impose a broad range of conditions in licensing the right to practice the patent, the doctrine of patent misuse “has largely been confined to a handful of specific practices by which the patentee seemed to be trying to ‘extend’ his patent grant beyond its statutory limits.” USM Corp. v. SPS Techs., Inc., 694 F.2d 505, 510 (7th Cir.1982).
Recognizing the narrow scope of the doctrine, we have emphasized that the defense of patent misuse is not available to a presumptive infringer simply because a patentee engages in some kind of wrongful commercial conduct, even conduct that may have anticompetitive effects. See C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1373 (Fed.Cir.1998) (“Although the defense of patent misuse ... evolved to protect against ‘wrongful’ use of patents, the catalog of practices labeled ‘patent misuse’ does not include a general notion of ‘wrongful’ use.”). Other courts have expressed the same view. See Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77, 84-85 (6th Cir.1971) (There is no such thing as “misuse in the air. The misuse must be of the patent in suit. An antitrust offense does not necessarily amount to misuse merely because it involves patented products or products which are the subject of a patented process.” (citations omitted)); McCullough Tool Co. v. Well Surveys, Inc., 395 F.2d 230, 238-39 (10th Cir.1968) (the defense of patent misuse has been allowed “only where there had been a misuse of the patent in suit”). While proof of an antitrust violation shows that the patentee has committed wrongful conduct having anti-competitive effects, that does not establish misuse of the patent in suit unless the conduct in question restricts the use of that patent and does so in one of the specific ways that have been held to be outside the otherwise broad scope of the patent grant.[2]
Although patent misuse has been mainly a judicially created defense, Congress has not been entirely silent about the doctrine. However, instead of saying what patent misuse is, Congress has said what it is not. Thus, section 271(d) of the Patent Act sets forth five types of conduct that may not provide the basis for finding “misuse or illegal extension of the patent right.” The last two of the five, which were added in 1988, are
(4) refusing] to license or use any rights to the patent; or (5) conditioning] the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.
35 U.S.C. § 271(d).
Importantly, Congress enacted section 271(d) not to broaden the doctrine of *1330 patent misuse, but to cabin it. See Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 201, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980) (addressing the role of section 271(d) in narrowing the scope of patent misuse). The 1988 amendment in particular was designed to confine patent misuse, with respect to certain licensing practices, to conduct having anticompetitive effects. See Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 41, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006); S.Rep. No. 100-492, at 9 (1988) (explaining that purpose of the amendment was to narrow the patent misuse doctrine, which “punish[es] innovators engaged in procompetitive distribution and licensing practices”); id. at 14 (“The lack of clarity and predictability in application of the patent misuse doctrine and that doctrine’s potential for impeding procompetitive arrangements are major causes for concern.”); 134 Cong. Rec. 32,471 (1988) (statement of Sen. Patrick Leahy) (“Reform of patent misuse will ensure that the harsh misuse sanction of unenforceability is imposed only against those engaging in truly anticompetitive conduct.”); id. at 32,-295 (statement of Rep. Robert Kastenmeier) (“[T]he proposed modifications should have a procompetitive effect, insofar as they require some linkage between patent licensing practice and anti-competitive conduct.”).[3]
The dissent argues that the 1988 amendment to section 271(d) makes it “quite clear that Congress intended that the patent misuse doctrine could extend to a refusal to license patented technologies by parties acting in concert.” That, however, is not how we interpret the statute or its legislative history. The statute itself contains no mention of concerted action. In the legislative history, Representative Kastenmeier described various licensing provisions that had been held to constitute patent misuse, including price fixing, covenants not to compete, resale price maintenance, and grantback licenses. 134 Cong. Rec. 32,295 (1988). The dissent points to the inclusion of “covenants not to compete” in Representative Kastenmeier’s list, and interprets that statement as an endorsement of the proposition that a concerted refusal to license a patent constitutes patent misuse. But Representative Kastenmeier described the listed practices as “patent licensing arrangements.” Id. Moreover, his catalog of unlawful practices corresponded to the list of proscribed practices set forth in the House bill, the “Patent Licensing Reform Act of 1988,” to which he alluded in his remarks. Id. at 32,294. Each of the prohibited practices listed in that bill was a condition on granting licenses, including the imposition of “covenants not to compete.” 134 Cong. Rec. 3261 (1988) (statement of Rep. Robert Kastenmeier); H.R. 4086, 100th Cong. (1988) (“unreasonably imposing as a condition of granting a license for a patent that the licensee may not produce or sell competing goods.”). From the context, it is clear that Representative Kastenmeier’s reference to “covenants not to compete” on which the dissent relies was an allusion to non-compete clauses in patent licenses, not to concerted refusals to license among horizontal competitors. Nor is there anything *1331 else in the legislative history that supports the dissent’s interpretation of Congress’s intent.
Section 271(d) is not directly implicated in this case because the conduct here at issue does not fall within any of the five statutorily defined categories. Nonetheless, the statute is pertinent because, as both the text and the legislative history of the 1988 amendment to section 271(d) make clear, Congress was concerned about the open-ended scope of the doctrine and sought to confine it to anticompetitive conduct by patentees who leverage their patents to obtain economic advantages outside the legitimate scope of the patent grant.
B
This case presents a completely different scenario from the eases previously identified by the Supreme Court and by this court as implicating the doctrine of patent misuse. Philips is not imposing restrictive conditions on the use of the Raaymakers patents to enlarge the physical or temporal scope of those patents. Instead, the alleged act of patent misuse that the panel focused on was the claimed horizontal agreement between Philips and Sony to restrict the availability of the Lagadec patent — an entirely different patent that was never asserted in the infringement action against Princo. Even if such an agreement were shown to exist, and even if it were shown to have anticompetitive effects, a horizontal agreement restricting the availability of Sony’s Lagadec patent would not constitute misuse of Philips’s Raaymakers patents or any of Philips’s other patents in suit.
Reduced to its simplest elements, the question in this case comes down to this: When a patentee offers to license a patent, does the patentee misuse that patent by inducing a third party not to license its separate, competitive technology? Princo has not pointed to any authority suggesting that such a scenario constitutes patent misuse, and nothing in the policy underlying the judge-made doctrine of patent misuse would support such a result.[4] Such an agreement would not have the effect of increasing the physical or temporal scope of the patent in suit, and it therefore would not fall within the rationale of the patent misuse doctrine as explicated by the Supreme Court and this court.
What patent misuse is about, in short, is “patent leverage,” i.e., the use of the patent power to impose overbroad conditions on the use of the patent in suit that are “not within the reach of the monopoly granted by the Government.” Zenith, 395 U.S. at 136-38, 89 S.Ct. 1562. What that requires, at minimum, is that the patent in suit must “itself significantly contribute!)] to the practice under attack.” Kolene Corp., 440 F.2d at 85. Patent misuse will not be found when there is “no connection” between the patent right and the misconduct in question, see Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 351 (9th Cir.1963), or no “use” of the patent, see Virginia Panel, 133 F.3d at 870. *1332 In this case, there is no such link between the putative misconduct and the Raaymakers patents.
Princo makes several arguments in its effort to bring this case within the scope of the traditional patent misuse doctrine. First, Princo contends that Philips “leveraged” its patents, as that term has been used in patent misuse cases, because it used the proceeds of its highly successful licensing program to fund royalty payments to Sony and because those payments gave Sony the incentive to enter into the alleged agreement to suppress the Lagadec patent. However, the use of funds from a lawful licensing program to support other, anticompetitive behavior is not the kind of “leveraging” that the Supreme Court and this court have referred to in discussing the leveraging of a patent that constitutes patent misuse. See C.R. Bard, 157 F.3d at 1373 (“Although the law should not condone wrongful commercial activity, the body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce.”). Even if such use of funds were to be deemed misconduct, it does not place any conditions on the availability of Philips’s patents to any potential licensees, so it is not the power of Philips’s patent right that is being misused.
Princo also argues that the Supreme Court has not required conventional “leveraging” of a patent in order to establish patent misuse. For that proposition, however, Princo relies on antitrust cases in which the Court stated that a patentee is not immunized against an antitrust violation by the privilege of a patent; those cases did not involve patent misuse or the enforceability of the defendants’ patents. See United States v. U.S. Gypsum Co., 333 U.S. 364, 396-400, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (finding unlawful price fixing and control of distribution of gypsum board); Standard Oil Co. (Ind.) v. United States, 283 U.S. 163, 174, 51 S.Ct. 421, 75 L.Ed. 926 (1931) (“[T]he limited monopolies granted to patent owners do not exempt them from the prohibitions of the Sherman Act.”). That is a different issue altogether from the issue before us, which is whether an infringing party can obtain immunity against a valid charge of patent infringement by showing an unrelated antitrust violation. Although the Lagadec patent and the Raaymakers patents were all included together in the Orange Book package licenses offered by Philips, those package licenses are independent of the antitrust violation that is now being alleged, i.e., a separate agreement between Philips and Sony to suppress the availability of the Lagadec technology.
In theory, the reason an agreement with Sony has value to Philips is because suppressing potential competition with the Raaymakers technology makes the Philips licenses more valuable. But that value does not derive from the fact that Sony is a co-licensor with Philips or the fact that the Lagadec patent is included in the package licenses. If the Lagadec patent were owned by an independent third party and not included in the Philips-Sony package licenses at all, an agreement between Philips and the third party to suppress the Lagadec technology would have exactly the same economic impact on Philips and Princo as the hypothesized agreement with Sony. That agreement might be vulnerable to challenge under the antitrust laws, but it could not reasonably be characterized as misuse of the Raaymakers patents. Thus, it does not follow from the possible existence of an antitrust violation with respect to Sony’s Lagadec patent that Philips is guilty of patent misuse with respect to the Raaymakers patents.
The dissent does not find fault with the terms of the licensing agreements between Philips and its licensees, but instead focuses its full attention on the purported hori *1333 zontal agreement between Philips and Sony to suppress the Lagadec technology. The dissent then characterizes that agreement as invoking the doctrine of patent misuse because it is “part and parcel” of the licensing agreements between Philips and its licensees. That characterization, however, is incorrect. The Orange Book licensing agreements control what the licensees may do; the purported agreement between Philips and Sony controls what Sony may do. At bottom, Princo’s complaint is not that its license to the Raaymakers patents is unreasonably conditioned, but that the Lagadec patent has not been made available for non-Orange-Book uses. And that is not patent misuse under any court’s definition of the term.
The purported agreement between Philips and Sony has none of the features that courts have characterized as constituting patent misuse. In particular, it does not leverage the power of a patent to exact concessions from a licensee that are not fairly within the ambit of the patent right. Although the dissent contends that using the leverage of a patent against licensees is not a necessary component of patent misuse, every one of the “patent misuse” cases cited by the dissent for that proposition have that very fact pattern (except for the Compton case, discussed above, in which the patentee agreed to place restrictions on his own right to compete). If the purported agreement between Philips and Sony not to license the Lagadec technology is unlawful, that can only be under antitrust law, not patent misuse law; nothing about that agreement, if it exists, constitutes an exploitation of the Raaymakers patents against Philips’s licensees.[5]
The Morton Salt case, which the dissent cites in support of its broad characterization of the doctrine of patent misuse, is a typical “tying” case in which the patentee leveraged its patent to a machine by insisting that its licensees purchase unpatented goods, to be used in connection with the machine, from the patentee. It was because of the unlawful condition on the patent license that the Court in Morton Salt declined to enforce the patent. Significantly, the Court explained that its ruling was based on the use of the patent “as a means of restraining competition with the patentee’s sale of an unpatented product,” and that the successful prosecution of an infringement action “is a powerful aid to the maintenance of the attempted monopoly of the unpatented product,” thus “thwarting the public policy underlying the grant of the patent.” 314 U.S. at 493, 62 S.Ct. 402. There is no such exploitation of the Raaymakers patents in this case.[6]
*1334 In sum, this is not a case in which conditions have been placed in patent licenses to require licensees to agree to anticompetitive terms going beyond the scope of the patent grant. Rather, in this case the assertion of misuse arises not from the terms of the license itself but rather from an alleged collateral agreement between Sony and Philips. In that setting, the doctrine of patent misuse does not immunize Princo against the legal effect of its acts of infringement.
C
Apart from Princo’s failure to show that Philips unlawfully leveraged its Raaymakers patents, a finding of patent misuse is unwarranted in this case because Princo failed to establish that the alleged agreement to suppress the Lagadec technology had anticompetitive effects. Whether viewed as a matter of patent misuse or in light of general antitrust principles, Princo’s claim regarding the alleged agreement fails because Philips and Sony acted legitimately in choosing not to compete against their own joint venture. Princo also failed to show that the asserted agreement had any anticompetitive effects because, as the Commission found, the Lagadec technology was not a viable potential competitor to the technology embodied in the Raaymakers patents.
At the outset, Princo urges us to overrule the line of authority in this court holding that patent misuse requires a showing that the patentee’s conduct had anticompetitive effects. We decline to do so. This court has observed that “[t]o sustain a misuse defense involving a licensing arrangement not held to have been per se anticompetitive by the Supreme Court, a factual determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market.” Windsurfing, 782 F.2d at 1001-02. We have consistently adhered to that requirement. See, e.g., Philips I, 424 F.3d at 1184; Monsanto, 363 F.3d at 1341; Virginia Panel, 133 F.3d at 868; B. Braun, 124 F.3d at 1426; Mallinckrodt, 976 F.2d at 708. Our position is consistent with the traditional characterization of the defense of patent misuse by the Supreme Court, see Ill. Tool Works, 547 U.S. at 38, 126 S.Ct. 1281 (describing the patent misuse doctrine as applying “when a patentee uses its patent ‘as the effective means of restraining competition with its sale of an unpatented article’ ”) (citation omitted); the decisions of other circuits, see County Materials Corp. v. Allan Block Corp., 502 F.3d 730, 736 (7th Cir.2007); Carpet Seaming Tape Licensing Corp. v. Best Seam Inc., 616 F.2d 1133, 1142 (9th Cir.1980); and the 1988 amendment to 35 U.S.C. § 271(d), which makes clear that Congress intended to limit patent misuse to practices having anti-competitive effects.
Turning from patent misuse law to antitrust principles, Princo contends that the hypothesized agreement between Philips and Sony not to license the Lagadec technology for non-Orange-Book purposes was a naked restraint of trade with no procompetitive justification, and that Philips’s conduct in entering into that agreement should render its Orange Book patents unenforceable. For the reasons set forth below, we disagree.
Although joint ventures can be used to facilitate collusion among competitors and are therefore subject to antitrust scrutiny, see NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 113, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), research *1335 joint ventures such as the one between Philips and Sony can have significant pro-competitive features, and it is now well settled that an agreement among joint venturers to pool their research efforts is analyzed under the rule of reason. See Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 52 (1st Cir.1998) (Joint venture research enterprises, “unless they amount to complete shams, are rarely susceptible to per se treatment. Where the venture is producing a new product ... there is patently a potential for a productive contribution to the economy, and conduct that is strictly ancillary to this productive effort ... is evaluated under the rule of reason.”); see generally Am. Needle, Inc. v. Nat’l Football League, — U.S. —, 130 S.Ct. 2201, 2207, — L.Ed.2d — (2010) (rule of reason generally applied to joint venture agreements); Texaco Inc. v. Dagher, 547 U.S. 1, 5-6, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006); Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 23, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); 15 U.S.C. § 4302 (conduct of research joint ventures is “not deemed illegal per se,” but is “judged on the basis of its reasonableness, taking into account all relevant factors affecting competition”); FTC & Dep’t of Justice, Antitrust Guidelines for Collaborations Among Competitors § 3.31(a), at 14 (2000) (most research joint venture agreements “are procompetitive, and they typically are analyzed under the rule of reason”); ABA, Antitrust Law Developments 445-46 (6th ed.2007) (“joint research ventures are typically analyzed under the rule of reason”).
Collaboration for the purpose of developing and commercializing new technology can result in economies of scale and integrations of complementary capacities that reduce costs, facilitate innovation, eliminate duplication of effort and assets, and share risks that no individual member would be willing to undertake alone, thereby “promot[ing] rather than hinder[ing] competition.” Dep’t of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property §§ 5.1, at 24; 5.5, at 28 (Apr. 6, 1995); see also Herbert Hovenkamp, Antitrust Law ¶ 2115a, at 110 (“[J]oint innovation often produces significant social benefits in relation to costs.”); FTC & Dep’t of Justice, Antitrust Guidelines for Collaborations Among Competitors § 2.1, at 6 (Apr.2000); Thomas A. Piraino, Jr., The Antitrust Analysis of Joint Ventures After the Supreme Court’s Dagher Decision, 57 Emory L.J. 735, 767-68 (2008); Joseph Kattan, Antitrust Analysis of Technology Joint Ventures: Allocative Efficiency and the Rewards of Innovation, 61 Antitrust L.J. 937, 938 (1993).
In particular, as we explained in Philips I, research joint ventures that seek to develop industry-wide standards for new technology can have decidedly procompetitive effects. The absence of standards for new technology can easily result in a “Tower of Babel” effect that increases costs, reduces utility, and frustrates consumers. As a leading treatise has noted, cooperation by competitors in standard-setting “can provide procompetitive benefits the market would not otherwise provide, by allowing a number of different firms to produce and market competing products compatible with a single standard.” Herbert Hovenkamp et al., IP & Antitrust § 35.2b (2010). Those benefits include greater product interoperability, including the promotion of price competition among interoperable products; positive network effects, including an increase in the value of products as interoperable products become more widely used; and incentives to innovate by establishing a technical baseline for further product improvements. See Patrick D. Curran, Comment, Standard-Setting Organizations *1336 Patents, Price Fixing, and Per Se Legality, 70 U. Chi. L.Rev. 983, 985-90 (2003). Congress has recognized those procompetitive features and has directed that the activities of a “standards development organization while engaged in a standards development activity” is subject to the rule of reason. See Standards Development Organization Advancement Act of 2004, Pub.L. No. 108-237 § 104, 118 Stat. 661, 663.
The “ancillary restraints” that are often important to collaborative ventures, such as agreements between the collaborators not to compete against their joint venture, are also assessed under the rule of reason. See Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 214, 223-30 (D.C.Cir.1986) (unlike a naked horizontal restraint that does not accompany a contract integration, “an ancillary horizontal restraint, one that is part of an integration of the economic activities of the parties and appears capable of enhancing the group’s efficiency, is to be judged according to its purpose and effect”); Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 189 (7th Cir.1985) (“A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output.”); Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 11 (1st Cir.1979) (agreement that “neither of the parties to the joint venture will compete with it” is “not offensive in and of itself’); United States v. Addyston Pipe & Steel Co., 85 F. 271, 280 (6th Cir.1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899) (“Restrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise were, of course, only ancillary to the main end of the union, and were to be encouraged.”); Hovenkamp, Antitrust Law ¶ 2115bl, at 113 (agreements between firms engaged in joint innovation not to innovate in the same area outside the context of the joint venture “are to be regarded as ancillary rather than naked restraints and are thus subject to the usual proof of power and anticompetitive effects”). Moreover, those ancillary restraints are not viewed in isolation, but in the context of the joint venture or other collaborative effort. Thus, agreements not to compete that might be suspect standing alone are regarded as reasonable when they are ancillary to “a larger endeavor whose success they promote.” Polk Bros., 776 F.2d at 189.[7]
Princo does not contend that the selection of the Raaymakers technology, rather than the Lagadec technology, for the Orange Book standard was a violation of the public policy in favor of free competition, nor did the panel so find. Instead, the panel focused on whether Sony and Philips agreed to suppress competition between the technology represented by the Orange Book standard and technology that *1337 fell outside the Orange Book standard, i.e., the Lagadec digital encoding technology. The Commission did not answer that question because the question was never squarely presented to it. Nor do we need to decide whether there was any such agreement between Sony and Philips. That is because the Commission’s factual findings make it clear that even if there was such an agreement, it did not have the effect of suppressing potentially viable technology that could have competed with the Orange Book standards.
The Commission found that “there has been no showing that the Lagadec '565 patent competes with another patent in the pool, no showing that the pool licensors would have competed in the technology licensing market absent the pooling arrangement, and no showing of the anti-competitive effect required under a rule of reason analysis.” The Commission supported that general finding with a series of specific findings based on the record before it.
First, the Commission noted that the evidence before the administrative law judge showed that the Lagadec technology “does not work well according to the Orange Book standards.” The Commission added that the administrative law judge “credited testimony that the Lagadec approach is prone to errors and ‘did not provide a scheme that would work and was reliable.’” Those findings were not limited to the unsuitability of using Lagadec to produce Orange-Book-compliant discs, as Princo argues. Instead, as is clear from the testimony on which those findings were based, the findings applied more generally to the technical problems presented by the Lagadec technology. The administrative law judge referred to testimony by Philips’s expert explaining that there is “a real problem” with the Lagadec digital approach and that “it is very difficult to carry out a decoding of this particular approach.” The expert added that “[a]s a result, Philips and Sony dismissed the Lagadec approach because this is a very difficult problem to solve and Lagadec just did not provide a scheme that would work and was reliable.... [F]rom basic physics, you can just see that this is not a good solution, and it really wouldn’t work well.”
The Commission also noted that Princo had not pointed to any evidence “that the Lagadec approach is a commercially viable technological alternative to the technology of [the Raaymakers patents].” By way of explanation, the Commission commented that “the commercial viability of a method that is prone to errors, unreliable, and unworkable is doubtful.” Based on the Commission’s use of the term “commercial viability,” Princo argues that the Commission used the wrong standard in evaluating the Lagadec technology. According to Princo, instead of addressing the commercial viability of that technology, the Commission should have limited its inquiry to whether Lagadec had “the technical potential to develop as a workable alternative.” The Commission, however, addressed both technical feasibility and commercial potential, and it found the Lagadec approach lacking in both respects.
Second, the Commission rejected the argument that Philips “included Sony in the [patent] pool not because Sony brought anything necessary to the CD-R/RW technology, but rather because Sony is a major player in the industry, whose cooperation Philips wanted.” The Commission found that assertion to be baseless and contrary to the testimony of several witnesses that Philips “partnered with Sony for technical reasons.” Thus, although Princo argues at length that the pooling arrangement was. not designed as a joint technical project between Philips and Sony, but rather as a means of allowing Philips to share its royalties with Sony in exchange for Sony’s *1338 agreement not to compete against the Orange Book standard, the Commission found to the contrary.
Finally, with respect to Princo’s related argument that including the Lagadec patent in the package licenses enabled Philips to avoid competition from non-Orange-book discs, the Commission stated that Princo had “not identified evidence establishing that, if Sony’s [Lagadec patent] were not included in the licenses, Sony likely would have developed technologies that competed against the Orange Book standard in a relevant market.” The Commission added that there was no evidence in the record that Sony “would have entered and survived to become a significant competitive force” in the CD-R/RW market with the Lagadec technology or that, absent the pooling arrangements, the pool licensors would have competed with the Orange Book technology.
Likewise, there was no evidence that any potential licensee might develop the Lagadec technology to compete with the Orange Book discs. Princo did not show that any potential disc manufacturer had ever been refused a license to the Lagadec patent for purposes of producing non-Orange-Book discs, or had even sought to explore that possibility. Nor has Princo pointed to any evidence that the Lagadec patent was anything more than a theoretical solution, or that the unavailability of a separate license to Lagadec for non-Orange-Book purposes resulted in some realistic foreclosure of competition.
While the suppression of nascent threats can be construed as anticompetitive behavior under certain circumstances, see United States v. Microsoft Corp., 253 F.3d 34, 79 (D.C.Cir.2001) (en banc), Princo had the burden of showing that the hypothesized agreement had an actual adverse effect on competition in the relevant market. See Cal. Dental Ass’n v. FTC, 526 U.S. 756, 775 n. 12, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999); In re Ciprofloxacin Hydrochloride Antitrust Litig., 544 F.3d 1323, 1332 (Fed.Cir.2008) (noting that an antitrust plaintiff bears the initial burden of showing an actual adverse effect on competition); see also Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 60 (2d Cir.1997) (antitrust plaintiff required to produce evidence that the challenged agreement could “significantly affect competition”); U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 596 (1st Cir.1993) (no rule of reason violation “[a]bsent a compelling showing of foreclosure [of competition] of substantial dimensions”); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1413 (9th Cir.1991) (antitrust plaintiff must show restraint is likely “to impair competition significantly”); DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1507 (11th Cir.1989) (antitrust plaintiff in rule of reason case bears the burden of showing that the challenged agreement had a “significant anti-competitive effect”); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1507c (antitrust plaintiff must introduce evidence that defendants “have restrained trade significantly” and have “impaired] competition” in a relevant market).
What Princo had to demonstrate was that there was a “reasonable probability” that the Lagadec technology, if available for licensing, would have matured into a competitive force in the storage technology market. See United States v. Penn-Olin Chem. Co., 378 U.S. 158, 175-76, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964) (requiring a finding that there was a reasonable probability that the competing companies would have “entered the market” or “remained a significant potential competitor”). It was not enough that there was some speculative possibility that Lagadec could have overcome the barriers to its technical feasibility and commercial success and become the basis for competing disc technology. The Commission found that Princo failed to show that the Lagadec technology *1339 had technical or commercial prospects that could enable it to compete with the Orange Book technology. Those findings wholly undermine Princo’s contention that this is a case in which the patents in suit have been used as part of an overall horizontal agreement with the effect of keeping a viable competitor out of the relevant market.
The dissenting opinion seeks to sidestep the Commission’s adverse factual findings by arguing that the burden of proof should have been placed on Philips, not Princo. The dissent acknowledges that an agreement among joint venturers who would otherwise be competitors is judged by the rule of reason. Within that framework, however, the dissent advocates a “quick look” rule of reason analysis on the ground that any agreement not to compete is inherently suspect and that competitive harm therefore should be presumed.
Quick-look analysis applies to “naked restraints] on price and output” where a detailed market analysis is unnecessary to conclude that the arrangements in question have anticompetitive effects. Cal. Dental, 526 U.S. at 769-70, 119 S.Ct. 1604. In those circumstances, only a quick look is necessary because the arrangement is “so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability.” Dagher, 547 U.S. at 7 n. 3, 126 S.Ct. 1276; see also Cal. Dental, 526 U.S. at 781, 119 S.Ct. 1604 (“The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion ... will follow from a quick (or at least quicker) look, in place of a more sedulous one.”). However, the Supreme Court has cautioned that presumptions of anticompetitiveness should not be lightly invoked. Broad. Music, 441 U.S. at 8-9, 99 S.Ct. 1551. Rather, the Court has stated:
[B]efore a theoretical claim of anticompetitive effects can justify shifting to a defendant the burden to show empirical evidence of procompetitive effects, as quick-look analysis in effect requires, there must be some indication that the court making the decision has properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive. Where, as here, the circumstances of the restriction are somewhat complex, assumption alone will not do.
Cal. Dental, 526 U.S. at 775 n. 12, 119 S.Ct. 1604.
A quick-look approach might be justified if the joint venture in this case were a sham, or if the alleged agreement were a naked restraint, i.e., not reasonably necessary to achieve the efficiency-enhancing benefits of the joint venture. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 338 (2d Cir.2008) (Soto-mayor, J., concurring). The Commission, however, rejected the contention that the joint venture between Philips and Sony was a sham. And, as we have discussed, an agreement among joint venturers not to compete against the joint venture is not a naked restraint, because it provides assurance that the resources invested by one joint venturer will not be undermined or competitively exploited to the sole benefit of the other. See id. at 340 (noting that exclusivity and profit-sharing provisions are reasonably necessary to prevent the free-rider problem). Particularly when the purpose of the joint venture is to set standards for an industry, and choices must be made as to which technologies to promote and which to suppress, those choices must be supported equally by all participants to the standard-setting body in order to achieve successful creation and adoption of the standard. See generally Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081 (Fed.Cir.2003).[8]
*1340 In sum, Prineo has- failed to show that the putative agreement between Sony and Philips not to license the Lagadec technology for non-Orange-Book purposes had any market effect at all — -actual or prospective. The record, and the findings of the Commission, make clear that the Lagadec technology lacked both the technical and the commercial prospects that would have made it a possible basis for a product that could compete with Orange-Book-compliant discs in the data storage market. For that reason, Prineo failed to demonstrate that any agreement not to license Lagadec would have had the anticompetitive effects necessary to condemn that agreement under rule-of-reason analysis.
Accordingly, we conclude that even if Philips and Sony engaged in an agreement not to license the Lagadec patent for non-Orange-Book purposes, that hypothesized agreement had no bearing on the physical or temporal scope of the patents in suit, nor did it have anticompetitive effects in the relevant market. The asserted agreement between Philips and Sony therefore did not constitute patent misuse and cannot justify rendering all of Philips’s Orange Book patents unenforceable.
AFFIRMED

. The en banc court has not addressed Princo’s arguments that the panel rejected. Accordingly, those portions of the panel's opinion are reinstated.

. Some courts and commentators have questioned the continuing need for the doctrine of patent misuse, which had its origins before the development of modem antitrust doctrine. See USM Corp., 694 F.2d at 511 ("Since the antitrust laws as currently interpreted reach every practice that could impair competition substantially, it is not easy to define a separate role for a doctrine also designed to prevent an anticompetitive practice — the abuse of a patent 'monopoly.”); Mark A. Lemley, The Economic Irrationality of the Patent Misuse Doctrine, 78 Cal. L.Rev. 1599, 1614-20 (1990). The Supreme Court's patent misuse cases have not been overruled, however, and we therefore apply the principles of patent misuse as that Court's decisions and our own prior precedents direct. Senza-Gel, 803 F.2d at 665 n. 5.

. The dissent refers on several occasions to the Supreme Court’s statement in Independent Ink that it "would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony would not constitute ‘misuse.’ ” 547 U.S. at 42, 126 S.Ct. 1281. In that statement, however, the Court was simply making the point that Congress's decision to require proof of market power to establish patent misuse was powerful evidence that Congress intended proof of market power to be similarly required to establish a criminal antitrust violation for the same conduct. The Court was not suggesting that every antitrust violation committed by a patentee constitutes patent misuse.

. Princo relies on a single case with unusual facts, Compton v. Metal Products, Inc., 453 F.2d 38 (4th Cir.1971), as support for its expansive patent misuse theory. In that case, the patentee agreed, as part of a patent licensing agreement, not to compete with the licensee for a period of 20 years. The court held that the non-compete agreement violated “the common law prohibition against agreements in restraint of trade as well as Section 1 of the Sherman Act,” and it further held that the agreement constituted patent misuse that rendered the underlying patents unenforceable against any third-party infringers. Id. at 44. That case is distinguishable on its facts, but to the extent the court in that case held the patents unenforceable based on the patentee's agreement to limit his own freedom of action, we find the court's conclusion that there was patent misuse to be unsupported by precedent or reasoning.

. The dissent suggests in passing that the Sony-Philips agreement also constitutes misuse of the Lagadec patent. How a patent that is not enforced can be misused is not explained, nor is it clear why misuse of the Lagadec patent should be a defense against infringement of different patents. The dissent cites language from a Second Circuit case, SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1204 (2d Cir.1981), which stated that “a concerted refusal to license patents” is unlawful and that “in such cases the patent holder abuses his patent by attempting to enlarge his monopoly beyond the scope of the patent granted him.” The court’s point was that such conduct could violate the antitrust laws; as such, we interpret the court's reference to "abus[ing] his patent” simply as a shorthand way of making that point, and not as a statement about the law of patent misuse.

. The dissenters argue that antitrust law is not adequate to protect victims of anticompetitive conduct by patentees and that the doctrine of patent misuse must be interpreted expansively to fill that gap. Antitrust law, however, provides robust remedies including both public and private enforcement. An accused infringer can raise a Sherman Act claim as a counterclaim in an infringement action or as an affirmative claim, and is eligible for treble damages and attorney's fees. As to the doctrinal limitations that apply to antitrust plaintiffs generally, such as the standing requirement, there is no reason to believe *1334 those limitations are inappropriate simply because a party is seeking relief against a patentee.

. Princo argues that the alleged agreement between Philips and Sony was not “ancillary'' to a collaborative joint venture, based on its factual contention that the Lagadec technology "was not the product of a joint venture, but rather was independently developed by Sony.” The panel opinion, however, rejected that argument, noting that "[t]he Lagadec and Raaymakers patents stem from the joint efforts of Philips and Sony engineers to develop recordable CDs in the late 1980s.... Philips and Sony ultimately chose to define the Orange Book standard using the analog Raaymakers ... approach, not the digital Lagadec method.” Princo, 563 F.3d at 1305-06. The panel’s opinion was supported by the administrative law judge's findings, and by evidence that Sony advanced the proposal that ultimately was incorporated into the Lagadec patent as part of an extended course of collaboration with Philips during the 1980s. See Hearing Tr. 372-409 (June 10, 2003). Nothing in Princo's en banc presentation persuades us that the panel's description of the development of the Lagadec technology was incorrect.

. In positing that the asserted agreement between Philips and Sony was unlawful, the *1340 dissent draws a distinction between an agreement that Sony would not compete with the joint venture and an agreement that Sony would not license the Lagadec patent to compete with the joint venture. That distinction is illusory. It would make no difference whether Sony developed the alternative technology itself or whether Sony facilitated the development of that technology by licensing a third party to do so; either way, Sony would be profiting at the expense of the joint venture.